Argued at Pendleton May 2, reversed July 6, 1977

# BELLA et ux, *Appellants,*
## *v.*
# AURORA AIR, INC. et al, *Respondents.*
## (TC 5808, SC 24736)
### 566 P2d 489

Douglas A. Shepard, Madras, argued the cause and filed briefs for appellants.

James C. Waggoner of Martin, Bischoff, Templeton & Biggs, Portland, argued the cause and filed a brief for respondents Aurora Air, Inc., dba Madras Air Service and Leo John Demers.

Rudy R. Lachenmeier of Vergeer, Samuels, Roehr & Sweek, Portland, argued the cause and filed a brief for respondent Kenneth Binder.

Before Denecke, Chief Justice,* and Howell, Bryson, Lent, Linde, and Campbell, Justices.

LINDE, J.

---

*Denecke, C. J., did not participate in the decision of this case.

## LINDE, J.

Plaintiffs, Mr. and Mrs. Allen Bella, appeal from a judgment n.o.v. that set aside a jury verdict for damage done to their mint crop by a herbicide which defendant Aurora was engaged to spray by airplane on the wheat field of their neighbor, Kenneth Binder. Most of the issues on appeal require this court to sort out the effects of procedural delays by the parties beyond the deadlines imposed by law: a late notice of crop damage by plaintiffs, a late appearance by defendants Aurora Air, Inc., and its owner, Leo John Demers, after default, and finally a late motion for judgment n.o.v.

The history of the case is this:

On Friday, June 13, 1975, Mr. Demers sprayed the herbicide 2,4-D on Mr. Binder's wheat field. Plaintiffs observed some of the mist reaching their adjoining property, and over the weekend a part of their mint crop began to show signs of damage. Mr. Bella called Demers to the farm to inspect the damage on Monday, June 16. Later he filed with the State Department of Agriculture a report of the loss, see ORS 634.172, which was dated August 15 and asserted discovery of the damage on June 15; but the report was not actually mailed before August 21 and received by the department on August 22. This was also the first time defendant Binder was notified. Plaintiffs' mint field was harvested on September 15, 1975.

The Bellas filed this action on October 28, 1975, and summons was served on Demers and Aurora that day. When these defendants had filed no appearance within 10 days, ORS 15.040, 16.040, plaintiffs on November 10, 1975, took a default judgment against them for $13,229.67 and costs. On November 12, Aurora and Demers moved to set aside the default judgment as having been due to their mistake, inadvertence, and excusable neglect, ORS 18.160. The trial court granted this motion on November 18 and on

[ 15 ]

November 25 entered an amended order setting aside the default judgment.

The case went to trial on plaintiffs' second amended complaint in July, 1976, resulting in a verdict for plaintiffs in the sum of $7,451.85. Judgment on this verdict was filed on August 5. Defendant Binder moved for judgment notwithstanding the verdict on August 9. On August 17, after the 10-day period prescribed by ORS 18.140 and 17.615 had elapsed, defendant Aurora Air, Inc., but not Demers, filed its motion asking for judgment n.o.v. and "joining" in Binder's earlier motion. The trial court granted judgment n.o.v. for all defendants with a memorandum opinion dated August 27, modified after reconsideration on September 20, 1976. This appeal followed.

For the sake of clarity, we shall deal separately with the positions of Aurora Air and its owner, Mr. Demers, and that of its customer, Mr. Binder.

## I. *Bella v. Aurora Air, Inc., and Demers*

■ A. *The default judgment.* ORS 18.160 empowers a trial court "in its discretion" to set aside a judgment taken against a party "through his mistake, inadvertence, surprise or excusable neglect." A trial court's order allowing or refusing a motion to set aside a default under this section is tested only for abuse of the granted discretion, so it is incumbent upon appellants to show such abuse.

■ Defendants' affidavit in support of their motion recited that on the same day the complaint and summons were served on them, they sent these documents to their liability insurance broker in Oakland, California, who transmitted them by way of the Los Angeles office of the underwriters' agents to their claims office in Memphis, Tennessee. The affidavit asserted, and we have no reason to doubt, that the delay before this office could assign counsel to defend its insured reflected the normal time spent in transmitting these documents through the mail. Of course

[ 16 ]

this does not in itself establish unavoidable delay and due diligence on the part of defendants. It is the named defendants who are summoned, not the insurance company with whom they may have contracted. This is different from cases like *Wagar v. Prudential Ins. Co.,* 276 Or 827, 556 P2d 658 (1976) and *Lowe v. Institutional Investors Trust,* 270 Or 814, 529 P2d 920 (1974), which involved failures or delays of communication among offices of defendant companies. While the question in such cases is whether there was inadvertence or excusable neglect within the defendant organizations, here it is whether the trial judge abused his discretion in relieving defendants from the consequences of their reliance on their insurance company to defend them; for as long as the statutory summons explicitly warns the named defendant of the risks of a failure to appear within the stated time, ORS 15.040, this reliance is not excusable neglect as a matter of course. *See Rogue Valley Memorial Hospital v. Salem Ins. Agency, Inc.,* 265 Or 603, 609, 510 P2d 845 (1973); *St. Arnold v. Star Expansion Ind.,* 268 Or 640, 655, 521 P2d 526, 522 P2d 477 (1974).

Another factor in the trial court's discretion is whether defendants accompanied their claim of mistake, inadvertence, or excusable neglect with the tender of a meritorious defense. While the statute does not mention it, decisions of this court since *White v. Northwest Stage Co.,* 5 Or 99 (1873), have required trial courts to consider the offered defense against plaintiff's complaint before setting aside a default. *See also Mayer v. Mayer,* 27 Or 133, 39 P 1002 (1895). Plaintiffs in this case urge that an answer consisting merely of a general denial does not meet this requirement, which seems to have long been the rule in many jurisdictions. *See* cases collected in 174 ALR 43 (1948). Defendants argue that their answer, by admitting much of the complaint and denying the rest, left no doubt which issues they were prepared to contest, and the trial court so understood it. In our view, the requirement of presenting a meritorious defense does

not turn on the form of the tendered motion or pleading; its object is that the trial court satisfy itself that there are in fact substantial issues to be decided before allowing a party to reopen a defaulted case. From the information before it the court could conclude that there were such issues in this case.

Finally, a fact that may have moved the trial court to exercise its discretion in favor of defendants is that they filed their motion to set aside the default judgment within two days after it had been entered. Diligence and lack of prejudice to plaintiffs are relevant even if not compelling circumstances, *see Hanthorn v. Oliver,* 32 Or 57, 62-63, 51 P 440 (1897), *Burke v. Rachau,* 262 Or 323, 338, 497 P2d 1154 (1972). On balance, we conclude that the court's order setting aside the default judgment did not exceed its discretion under ORS 18.160.

B. *The judgment n.o.v.* After Aurora and Demers succeeded in having their default set aside, the case was tried to a jury, which returned a verdict for $7,451.85 damages against all defendants. Judgment on this verdict was entered on August 5, 1976. On August 17, Aurora moved for a judgment notwithstanding the verdict. This motion also claimed to "join" in a similar motion that had been filed on August 9 by defendant Binder. No motion was filed on behalf of defendant Demers. The trial court granted judgment n.o.v. for all defendants, on the ground that plaintiffs had failed to comply with the requirements of notice of loss from aerial spraying imposed by ORS 634.172.

Plaintiffs attack the judgment n.o.v. for Aurora because Aurora's motion was not filed within the statutory 10-day deadline, ORS 18.140, 17.615. Aurora offers three responses. First, it argues that the court's error in granting its untimely motion "would be harmless in view of [Aurora's earlier] motions for nonsuit and directed verdict and defendant's consequent right to appeal." That might be so if Aurora had

[ 18 ]

in fact cross-appealed from the denial of those earlier motions, but it did not; so those rulings are not before us. The mere fact that they were made cannot relieve a party from the time limit when the motion for judgment n.o.v. requires an earlier motion for a directed verdict, ORS 18.140. The substitution of the correct ruling for an erroneous judgment n.o.v. without a cross-appeal, *see* ORS 19.130(2), was permitted in *German v. Kienow's Food Stores,* 246 Or 334, 425 P2d 523 (1967), but in that case defendant had moved for a new trial in the alternative, and both motions were timely.

■ Second, Aurora asserts that it "merely joined" belatedly in defendant Binder's timely motion. But Aurora, the pesticide applicator, and Binder, its customer, were separate defendants, represented by separate counsel, and arguably subject to distinct theories of liability and different applications of ORS 634.172, the law at issue on the motions. A ruling for Binder on his defense would not necessarily establish a defense for Aurora. If the court was to accept Aurora's defense after the verdict, it had to do so on Aurora's own timely motion.

■ Finally, however, Aurora argues that no motion at all is needed for a judgment n.o.v. because the court could grant it on its own motion. Such judgments are governed by ORS 18.140, which, insofar as applicable here, provides:

> . . . [W]hen a motion for a directed verdict which should have been granted has been refused and a verdict is rendered against the applicant, the court may, *on motion,* render a judgment notwithstanding the verdict, or set aside any judgment which may have been entered and render another judgment, as the case may require. (Emphasis added.)

Some statutes expressly contemplate action by a court "on its own motion," for instance in granting a new trial. ORS 17.630. We read "on motion" in ORS 18.140 to mean that a motion is required before the court can enter a judgment notwithstanding a verdict or in lieu

of a previously entered judgment, and the trial court, having Binder's timely motion before it, did not act on its own motion with respect to Aurora.[1] Since the court had been given no legal basis to grant judgments n.o.v. for Aurora or, *a fortiori,* for Demers, these judgments must be reversed.

## II. *Bella v. Binder*

Plaintiffs' action against Binder was based on his strict liability in trespass for damage done to others by the herbicide which he contracted with Aurora to spray on his wheat field. *Loe v. Lenhardt,* 227 Or 242, 362 P2d 312 (1961). After the jury verdict for plaintiffs, the court granted Binder's motion for judgment n.o.v. on the ground that plaintiffs had not made a timely report of the loss to the State Department of Agriculture with copy to Binder, as required by ORS 634.172. The questions raised on appeal are whether plaintiffs' compliance with the statute was put in issue by the pleadings, whether a claimant's failure to comply with that section is a defense to the person for whom the spraying is done, and if so, whether plaintiffs in fact did substantially comply with the statute. In addition, defendant urges that judgment notwithstanding the verdict was proper on the separate ground that the spraying in this case was not an "ultrahazardous activity."

A. *The pleadings.* Plaintiffs' complaint stated that they filed a report of loss and mailed copies to the defendants "[p]rior to the harvest of 50% of the peppermint crop". This allegation referred to the second sentence of ORS 634.172(1). The entire subsection reads:

> No action against a pesticide operator, arising out of the use or application of any pesticide, shall be commenced unless the claimant has filed a report of the loss

---

[1] Aurora also invokes the court's discretion to set aside a judgment under ORS 18.160, *supra*; but, apart from the conflict between such a reading of that section and the specific provisions of ORS 18.140, defendant does not claim that the judgment it moved to set aside was due to its own "mistake, inadvertence, surprise or excusable neglect."

with the department, and mailed or personally delivered a true copy of such report of loss to the pesticide operator allegedly responsible and a true copy of such report to the person for whom such work was done, if other than himself, within 60 days from the occurrence of such loss or within 60 days from the date when the claimant discovered that such loss had occurred. If the damage is alleged to have been caused to growing crops, the report shall be filed prior to the time when 50 percent of the crop is harvested.

Plaintiffs' theory is that only the time limit of the second sentence governs claims for damage to growing crops. Defendant's answer included a general denial of the quoted allegation but no separate allegation of plaintiffs' failure to give timely notice under the first part of ORS 634.172(1).

The effect of these pleadings is in controversy because a prior decision under this statute stated that "it was incumbent upon [defendant] to allege and prove failure to comply with the statute under consideration and that, not having done so, the objection was waived." *Cross v. Harris,* 230 Or 398, 405, 370 P2d 703 (1962). Thus Binder would have had to raise the alleged non-compliance as a defense if the complaint had been silent on the issue. But the complaint was not silent. The material difference between its allegation of a timely report and defendant's denial concerns the proper interpretation of the statutory requirement, not the facts. Under these circumstances, it would be hypertechnical to hold that the pleadings did not put plaintiff's compliance with the statute in issue.

B. *Notice as a prerequisite.* On its face, ORS 634.172(1), quoted above, makes timely filing of the report of loss a prerequisite only for an action against a pesticide operator, in this case Aurora and Demers.[2] The statute as a whole provides for Department of Agriculture regulation of pesticides and their uses and

---

[2]Demers would be a "pesticide operator" as the owner or manager of Aurora; as a pilot, he would be a "pesticide applicator." ORS 634.006(9), (13).

[ 21 ]

the licensing of pesticide operators, applicators, and dealers. It states nothing with respect to civil actions against persons other than pesticide operators.[3] Thus the plaintiffs' delayed filing under ORS 634.172(1) does not expressly affect their action against the person who engaged the pesticide operator. The parties and the court seem to have so assumed with respect to the employing landowner in *Loe v. Lenhardt, supra,* 227 Or at 255.

Defendant challenges this conclusion on two grounds. One is that his liability is derivative from the operator's liability and therefore should be barred if the action against the operator is barred. The trial court accepted this argument, stating that a contrary holding would be illogical and would defeat the statutory requirement insofar as the employing landowner, if liable without a prior report of loss, would be entitled to indemnity from the pesticide operator. Whatever its merits as an original proposition, this argument was foreclosed when *Loe v. Lenhardt, supra,* held the landowner's liability to be independent of and not derivative from the operator's.

The more difficult issue is posed by the argument, also accepted by the trial court, that the statutory requirement protects defendant whether or not his liability derives from that of the operator. ORS 634.172(1), *supra,* requires that copies of the report of loss to the department be served on "the person for whom such work was done" as well as on the pesticide operator before the operator may be sued. The apparent purpose of the requirement as a whole is to secure an opportunity to examine the evidence of damage by defendants and by an independent public official before it is submerged by organic or other changes or by harvest. But it is not apparent why a defendant pesticide operator would be helped by service of the report of loss on the person who engaged him, and our

---

[3] ORS 634.172(2) and (5) deal with claims against public agencies.

search of the legislative history sheds no light on the purpose of this requirement.

■ We agree with the trial judge that the most plausible purpose of requiring such service is to protect the employing landowner, as well as the pesticide operator, against an unexpected claim for damages to the property of another long after evidence of the particular circumstances and the alleged loss can be readily reconstructed by them. Yet it also remains true that the law makes compliance with its requirement a prerequisite only in actions against the operator, and we do not readily extend such strict and short-term limitations on private lawsuits when it is not clear that the legislature meant to do so. Perhaps a way to give effect to the apparent legislative objective of protecting a potentially liable landowner might be to allow him, in a proper case, to show prejudice in fact from failure to receive any notice of a plaintiff's alleged pesticide damage before the evidence is beyond examination; but this is not that case. In this case defendant was sent a copy of the report of loss within a few days after the 60 days prescribed in ORS 634.172(1) and before 50 per cent of the affected crop was harvested, as prescribed in the second sentence of that subsection. There is no evidence to suggest that this brief delay prejudiced Binder's defense. Since this defendant cannot invoke strict adherence to the statute as such but, at best, only a possible extrapolation of its assumed policy, he was not entitled to judgment n.o.v. by reason of that delay.

■ C. *The basis of liability.* In moving for a nonsuit, a directed verdict, and judgment n.o.v., defendant contended that the aerial spraying of 2,4-D was not an "ultrahazardous activity" in the place and under the conditions of this case. If these motions should properly have been allowed, the judgment n.o.v. must stand even though granted on a different ground. *Cf. Short v. D.R.B. Logging Co.,* 192 Or 383, 393, 232 P2d 70, 235 P2d 340 (1951); *Slate Construction Co. v. Pacific Gen'l Contractors, Inc.,* 226 Or 145, 151, 359 P2d 530 (1961).

[ 23 ]

■ This court has stated that whether an activity is "ultrahazardous," or to use the later term, "abnormally dangerous," so as to impose liability without negligence, is to be determined not in the abstract but in the locality and circumstances where it is done; and it is to be determined by the court. *Loe v. Lenhardt, supra,* 227 Or at 251; *McLane v. Northwest Natural Gas Co.,* 255 Or 324, 328, 467 P2d 635 (1970); *Nicolai v. Day,* 264 Or 354, 358, 506 P2d 483 (1973). The terms "hazard," "risk," or "danger" are themselves some hazard to clarity, since they combine in a single conclusion the two distinct variables of the probability of the threatened harm, a judgment about facts, and its gravity, which is a value judgment. When the harm threatened by the activity is very serious, even a low probability of its occurrence can suffice to invoke the standard. *See McLane v. Northwest Natural Gas Co., supra,* 255 Or at 329. Likewise, even when the risk only moderately threatens economic activities rather than harm to life, health, or property or environment, *see* ORS 634.012, the activity may nevertheless be "abnormally dangerous" if it can be carried on only with a substantially uncontrollable likelihood that the damage will sometimes occur. That is what this court concluded about crop dusting or spraying in *Loe v. Lenhardt, supra,* where there was some dispute whether the particular formula used constituted a herbicide, 227 Or at 249, 251.[4] However, with respect to 2,4-D the legislature itself has concluded that it falls within the concerns that prompted enactment of ORS chapter 634, which are the danger of the regulated activities to health, property, wildlife, and environment. ORS 634.012, 634.016(6), 634.026. The 1973 revision of the statute specifically prohibited the use of "isopropyl ester of 2,4-D, or any other ester of equal or higher volatility with regard to plant damage"

___

[4] A recent review of developments in this field states that Oregon is the only jurisdiction to have placed liability on *Loe's* theory of unintentional trespass resulting from an abnormally dangerous activity. Kennedy, *Liability in the Aerial Application of Pesticides,* 22 S Dak L Rev 75, 86 (1977).

without a permit from the department, ORS 634.372(21), and permits to use 2,4-D are to be issued only upon a determination that its use "will not damage agricultural and forest products and susceptible crops," ORS 634.322(10).[5] In the light of this legislation, when damage does occur, it did not require proof for the court to decide that the aerial spraying of 2,4-D in the vicinity of broadleafed crops is an abnormally dangerous activity within the standards set by *Loe v. Lenhardt, supra,* and its sequels.

Since the judgment notwithstanding the verdict cannot be sustained on either ground advanced for it, it must be reversed as to all defendants and the jury verdict reinstated.

Reversed.

---

[5]The record does not show whether either Binder or Aurora had obtained a permit to use 2,4-D.